**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA**

**HUNTINGTON DIVISION**

PEGGY A. HOOD,

      **Plaintiff,**

v.                           CIVIL ACTION NO. 3:07-00641

MICHAEL J. ASTRUE,
**Commissioner of the Social**
**Security Administration,**

      **Defendant.**

**<u>MEMORANDUM OPINION</u>**

This is an action seeking review of the decision of the Commissioner of Social Security (hereinafter "Commissioner") denying Claimant's applications for disabled widow's insurance benefits ("DIB") and supplemental security income ("SSI"), under Titles II and XVI of the Social Security Act, 42 U.S.C. §§ 401-433, 1381-1383f. (Docket No. 2). Both parties have consented in writing to a decision by the United States Magistrate Judge. (Docket Nos. 6 and 7).

**I.    <u>Procedural History</u>**

Plaintiff, Peggy Ann Hood (hereinafter "Claimant"), filed applications for SSI on June 8, 2004 (Tr. at 394-396)[1] and DIB on December 29, 2004 (Tr. at 61-63), alleging disability as of December 13, 1983, due to the following conditions: bulging discs; arthritis in her knees, neck, hands, and elbows; speech difficulties; a learning disability;

---

[1] Claimant signed and dated the Application June 9, 2004. However, the Court determines the correct date to be June 8, 2004, based on the date stamp appearing at the top of each page of the document.

a hiatal hernia; depression; and high blood pressure (Tr. at 83-90). The claims were denied initially (Tr. at 398-400)[2] and upon reconsideration (Tr. at 404-406 and 43-45).

Thereafter, Claimant requested an administrative hearing. (Tr. at 46). The hearing was held on June 8, 2006 before an Administrative Law Judge, the Honorable James D. Kemper, Jr. (hereinafter referred to as the "ALJ"). (Tr. at 407-444). By decision dated April 26, 2007, the ALJ determined that Claimant was not entitled to benefits. (Tr. at 11-26).

Under 42 U.S.C. § 423(d)(5) and § 1382c(a)(3)(H)(i), a claimant for disability benefits has the burden of proving a disability. *See Blalock v. Richardson*, 483 F.2d 773, 774 (4th Cir. 1972). A disability is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable impairment which can be expected to last for a continuous period of not less than 12 months" 42 U.S.C. § 423(d)(1)(A). The Social Security Regulations establish a "sequential evaluation" for the adjudication of disability claims. 20 C.F.R. §§ 404.1520, 416.920 (2006). If an individual is found "not disabled" at any step, further inquiry is unnecessary. §§ *Id.* 404.1520(a), 416.920(a).

The first inquiry under the sequence is whether a claimant is currently engaged in substantial gainful employment. *Id.* §§ 404.1520(b), 416.920(b). If the claimant is not engaged in substantial gainful employment, the second inquiry is whether claimant suffers from a severe impairment. *Id.* §§ 404.1520(c), 416.920(c). If a severe impairment is present, the third inquiry is whether such impairment meets or equals any of the

---

[2] Only the documentation of the initial denial of Claimant's SSI Claim appears in the Social Security Transcript. The documentation of the denial of Claimant's DIB Claim is absent.

impairments listed in Appendix 1 to Subpart P of the Administrative Regulations No. 4. *Id.* §§ 404.1520(d), 416.920(d). If it does, the claimant is found disabled and awarded benefits. Id. If it does not, the fourth inquiry is whether the claimant's impairments prevent the performance of past relevant work. *Id.* §§ 404.1520(e), 416.920(e).

By satisfying inquiry four, the claimant establishes a prima facie case of disability. *Hall v. Harris*, 658 F.2d 260, 264 (4th Cir. 1981). The burden then shifts to the Commissioner, *McLain v. Schweiker*, 715 F.2d 866, 868-69 (4th Cir. 1983), and leads to the fifth and final inquiry: whether the claimant is able to perform other forms of substantial gainful activity, considering claimant's remaining physical and mental capacities and claimant's age, education and prior work experience. 20 C.F.R. §§ 404.1520(f), 416.920(f) (2006). The Commissioner must show two things: (1) that the claimant, considering claimant's age, education, work experience, skills and physical shortcomings, has the capacity to perform an alternative job, and (2) that this specific job exists in the national economy. *McLamore v. Weinberger*, 538 F.2d 572, 574 (4th Cir. 1976).

In this particular case, the ALJ determined that Claimant met the non-disability requirements for disabled widow's benefits set forth in § 202(e) of the Social Security Act because she was the unmarried widow of the deceased insured worker and had attained the age of 50. (Tr. at 16, Finding No. 1). Claimant's prescribed period for benefits will end on May 31, 2011; thus, she must prove that she was disabled on or before that date. (*Id.* at Finding No. 2). The ALJ found that Claimant satisfied the first inquiry because she had not engaged in substantial gainful activity since the alleged

onset date. (*Id.* at Finding No. 3).[3] Under the second inquiry, the ALJ found that Claimant suffered from four severe impairments: chronic back pain secondary to degenerative disc disease, osteoarthritis of the right knee, depression, and borderline intellectual functioning. (*Id.* at Finding No. 4). At the third inquiry, the ALJ concluded that Claimant's impairments did not meet or equal the level of severity of any listing in Appendix 1. (*Id.* at Finding No. 5). The ALJ then found that Claimant had a residual functional capacity (hereinafter referred to as "RFC") for light work, reduced by exertional and nonexertional limitations. (*Id.* at Finding No. 6). As a result, Claimant could not return to her past relevant work. (*Id.* at Finding No. 7).[4]

The ALJ found that Claimant was defined as an individual "closely approaching advanced age," that she had at least a high school education, and that she could communicate in English. (*Id.* at Finding Nos. 8 and 9). Therefore, he concluded that transferability of job skills was not material to determining disability because the Medical-Vocational Rules supported a finding that Claimant was not disabled regardless of whether she had transferable job skills. (*Id.* at Finding No. 10).[5] Based on the evidence and the testimony of a vocational expert, the ALJ concluded that Claimant

---

[3] Although Claimant worked as a sales associate from July 1999 through September 2000, as a medical billing clerk from January 2001 through May 2001, and as a cashier from June 2002 through July 2002, the ALJ afforded Claimant the "benefit of the doubt" in finding that that those periods constituted unsuccessful work attempts and did not demonstrate actual substantial gainful activity. (Tr. at 16, Finding No. 3).

[4] The vocational expert testified at the administrative hearing that Claimant could return to her past work as a medical billing clerk. However, the ALJ concluded that Claimant's employment as a medical billing clerk constituted an unsuccessful work attempt, not actual substantial gainful activity, and thus, it did not qualify as past relevant work. (Tr. at 16, Finding No. 7).

[5] The Medical-Vocational Rules appear at 20 C.F.R. Part 404, Subpart P, Appendix 2.

could perform jobs such as house sitter/companion, grader/sorter, bench worker, and information clerk, which exist in significant numbers in the national and regional economy. (*Id.* at Finding No. 11). On this basis, the ALJ denied benefits. (Tr. at 26).

On August 14, 2007, the Appeals Council denied Claimant's request for review, making the above ALJ Decision the final decision of the Commissioner of Social Security. (Tr. at 4-6).  On October 15, 2007, Claimant filed the present action seeking judicial review of the administrative decision pursuant to 42 U.S.C. § 405(g) and applied to proceed without prepayment of fees or costs. (Docket Nos. 2 and 1). Her application to proceed without prepayment of costs and fees was granted on May 18, 2009. (Docket No. 8).

On July 14, 2009, the Commissioner moved to voluntarily remand the case pursuant to the sixth sentence of 42 U.S.C. § 405(g) because he could not locate the claim file of the ALJ's decision and was thus unable to produce a complete administrative record. (Docket No. 10). The Motion was granted. (Docket No. 11). On July 23, 2009, the Commissioner moved to vacate the Order granting remand because the claim file was located. (Docket No. 12). This Motion was granted and the case was reinstated to the active docket. (Docket No. 14). On July 24, 2009, the Commissioner filed his Answer to the Complaint. (Docket No. 15).

On March 15, 2010, the Court ordered Claimant to file her brief in support of the Complaint, which was due on August 24, 2009. (Docket No. 16). Claimant filed her brief on March 21, 2010 and the Commissioner filed his brief on April 21, 2010. (Docket Nos. 17 and 18). The matter is therefore ripe for resolution.

## II.    <u>Scope of Review</u>

The sole issue before this Court is whether the final decision of the Commissioner denying Claimant's applications for benefits is supported by substantial evidence. In *Blalock v. Richardson*, substantial evidence was defined as the following: Evidence which a reasoning mind would accept as sufficient to support a particular conclusion. It consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance. If there is evidence to justify a refusal to direct a verdict were the case before a jury, then there is "substantial evidence." *Blalock v. Richardson*, 483 F.2d 773, 776 (4th Cir. 1972), quoting *Laws v. Celebrezze*, 368 F.2d 640, 642 (4th Cir. 1966).

Additionally, the Commissioner, not the court, is charged with resolving conflicts in the evidence. *Hays v. Sullivan*, 907 F.2d 1453, 1456 (4th Cir. 1990). The Court will not re-weigh conflicting evidence, make credibility determinations, or substitute its judgment for that of the Commissioner. *Id.* However, the Court must not abdicate its "traditional function" or "escape [its] duty to scrutinize the record as a whole to determine whether the conclusions reached are rational." *Oppenheim v. Finch*, 495 F.2d 396, 397 (4th Cir. 1974). The ultimate question for the Court is whether the decision of the Commissioner is well-grounded, bearing in mind that "[w]here conflicting evidence allows reasonable minds to differ as to whether a claimant is disabled, the responsibility for that decision falls on the [Commissioner]." *Walker v. Bowen,* 834 F.2d 635, 640 (7th Cir. 1987). A careful review of the record reveals that the Decision of the Commissioner is supported by substantial evidence.

### III.    Claimant's Background

Claimant was 51 years old at the time of the administrative hearing. (Tr. at 409). She completed one year of business school. (Tr. at 410). Her past relevant work experience included employment as a medical biller and as a cashier at a sewing and crafts store. (Tr. at 410-412). She left her final job in order to care for her husband who was ill. (Tr. at 412).

### IV.    The Medical Record

The Court has reviewed all evidence of record, including the medical evidence of record. The record includes medical evidence which was received prior to the administrative hearing and evidence which was received subsequent to the hearing. All such evidence was considered by the ALJ in issuing his decision on April 26, 2007.

####    a.    Evidence Received Prior to the Hearing

On September 11, 1998, Rafia Haque, M.D., evaluated Claimant for back pain. (Tr. at 139-140). A Computed Tomography (hereinafter "CT") scan showed disc protrusion at L5-S1 and possible disc protrusion toward the right posterior. (Tr. at 140).

On September 5, 2001, Claimant was seen as new patient by Terrence W. Triplett, M.D., at Ultimate Health Services, Inc. (Tr. at 328). Dr. Triplett noted that Claimant had "chronic ear popping and itching as her active problems," but that a review of her systems was "otherwise negative" and that he would see her again in six months. Id.

On April 15, 2002, William Given, M.A., conducted a consultative examination. (Tr. at 141-148). Claimant was given a Wechsler Adult Intelligence Scale-III (WAIS-III)

7

assessment and she achieved a verbal IQ score of 72, a performance IQ score of 83, and

a full scale IQ score of 75. (Tr. at 143). Mr. Given stated:

> [Claimant's full scale IQ was at] the 5th percentile range and in the borderline range of intelligence. However, differences between the IQs and Index Scores suggest that all of these scores must be considered to best understand her overall functioning...Much of the difference in her scores is due to limited efficiency on tasks reflecting higher-level concentration...She displayed relatively strong auditory memory, and visual memory was nearly as well developed. Screening of academic skills revealed a borderline deficit in mathematics. Other skills were developed consistently with intellectual functioning, but she failed to achieve literacy levels in reading, and barely achieved that level in writing...Observations and patterns suggest the following disorders: Learning Disorder, NOS; Expressive Language Disorder; Phonological Disorder...The disorders are thought to be at least moderate in severity, and will hamper her considerably in formal training and work settings.

(Tr. at 146).

During the period of October 21, 2003 through January 4, 2005, Ebenezer

Medical Outreach listed Claimant's medical issues as anxiety/depression, hypertension,

chronic low back pain, a hiatal hernia, a gastric ulcer, diverticulitis, and a family history

of breast cancer through her mother. (Tr. at 210, 200). At various points throughout this

period, Claimant was prescribed Atacand, Effexor, Vioxx, Norflex, Ultram, Claritin,

Celebrex, and Nexium.[6] *Id.*

On March 18, 2003 through August 23, 2004, Claimant received physical therapy

from Westmoreland Physical Therapy. (Tr. at 162-172). Her final evaluation stated that

Claimant received five treatments and failed to appear for subsequent sessions. (Tr. at

---

[6] These medications are generally prescribed for the following purposes: Atacand for hypertension; Effexor for anxiety/depression; Vioxx and Celebrex for arthritis; Norflex and Ultram for muscle pain and stiffness; Claritin for allergies; and Nexium for gastrointestinal issues.

64). The only abnormal finding concerned Claimant's range of motion of her back. (Tr. at 163).

On August 20, 2004, Brian Bailey, M.A., conducted a consultative examination. (Tr. at 156-161). Claimant was referred to Mr. Bailey from the Department of Disability Services (hereinafter "DDS") for an evaluation to assist in the determination of her eligibility for Social Security benefits. (Tr. at 156). The information used in the examination was provided solely by Claimant and she was deemed a reliable informant. Id. Mr. Bailey diagnosed Claimant with Major Depressive Disorder, Single Episode, Moderate; Phonological Disorder; and Maladaptive Health Behaviors, such as lack of exercise affecting obesity and hypertension. (Tr. at 160).

On August 17, 2004, Rodolfo Gobunsuy, M.D., conducted a consultative examination. (Tr. at 149-155). Claimant was told to have bulging discs and arthritis based on a CAT scan and x-ray of her lumbar spine. (Tr. at 151). She also had arthritic changes in her knees; radicular symptoms down her left leg consistent with lumbar disc disease; limited anterior bending of the lumbar spine due to her obese abdomen, but straight leg raising was satisfactory; symptoms of carpel tunnel syndrome; no Tinel sign, but positive Phalen sign; and no problems using her hands. Id.

On October 6, 2004, DDS physician, Joseph Kuzniar, Ed.D., completed a Psychiatric Review Technique Form, assessing Claimant's mental condition dating back to June 7, 2004. (Tr. at 181-194). Dr. Kuzniar found that Claimant suffered from two mental disorders: (1) an organic mental impairment as evidenced by a phonological disorder and (2) an affective disorder characterized by disturbance of mood,

accompanied by depressive syndrome, as evidenced by anhedonia (pervasive loss of interest in almost all activities), sleep disturbance, decreased energy, and difficulty concentrating or thinking. (Tr. at 181-184). He found that Claimant did not suffer from any other mental disorders. (Tr. at 182-190). On a scale of "none," "mild," "moderate," "marked," and "extreme," Dr. Kuzniar rated Claimant mildly restricted in activities of daily living and maintaining social functioning; moderately limited in maintaining concentration, persistence, or pace; and that there were no episodes of decompensation of extended duration. (Tr. at 191).

On the same date, Dr. Kuzniar completed a RFC Assessment Form. (Tr. at 195-198). On a scale of "not significantly limited," "moderately limited," "markedly limited," and "no evidence of a limitation," he found the following:

> Claimant was "not significantly limited" in her ability to remember locations and work-like procedures; perform activities within a schedule, maintain regular attendance, and be punctual within customary tolerances; work in coordination with or proximity of others without being distracted by them; complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods; interact appropriately with the general public; accept instructions and respond appropriately to criticism from supervisors; get along with coworkers or peers without distracting them or exhibiting behavioral extremes; respond appropriately to changes in the work setting; travel in unfamiliar places or use public transportation; and set realistic goals or make plans independently of others.
>
> Claimant was "moderately limited" in her ability to understand, remember, and carry out detailed instructions and maintain attention and concentration for extended periods.
>
> There was "no evidence" that Claimant was limited in her ability to understand, remember, and carry out very short and simple instructions; sustain an ordinary routine without special supervision; make simple work-related decisions; ask simple questions or request assistance; maintain socially appropriate behavior

and adhere to basic standards of neatness and cleanliness; and be aware of normal hazards to take appropriate precautions.

(Tr. at 195-196).

On September 7, 2004, DDS physician, Atiya Lateef, M.D., completed a Physical RFC Assessment Form, assessing Claimant's "current" condition. (Tr. at 173-180). Dr. Lateef listed Claimant primary diagnosis as "DJD L/S Spine," which the Court interprets as Degenerative Joint Disease of the lumbrosacral spine; her secondary diagnosis as "DJD" of the knees and morbid obesity; and her other alleged impairments as hypertension, depression, gastrointestinal reflux disease, and temporomandibular joint syndrome. (Tr. at 173). In rating Claimant's exertional limitations Dr. Lateef found that Claimant could do the following:

> Occasionally lift 20 pounds
> Frequently lift 10 pounds
> Stand and/or walk with normal breaks for at least 2 hours in an 8-hour workday
> Sit with normal breaks for about 6 hours in an 8-hour workday
> Push and/or pull an unlimited amount, other than as shown for lift and/or carry

(Tr. at 174). In the section where Dr. Lateef was asked to explain how and why the evidence supported her conclusions and the specific facts upon which her conclusions were based, she stated:

> Walks steadily without limp or antalgia.
> Extremities revealed fine varicose veins [with] + 1 edema.
> Distal pulses are intact.
> Neuro- no muscle weakness or atrophy.
> Cranial nerves II-XII- grossly intact.
> Lumbar spine is tender [at] the lower lumbar to the upper sacral.
> The knees have crepitations, more on the [left] side, and the [left] knee is tender medially and laterally.
> She has radicular symptoms, down to her [left] leg consistent with lumbar disc disease.
> Anterior bending of the lumbar spine is limited as her abdomen is obese but SLR is satisfactory.

11

> X-ray [left] knee- moderate degenerative arthritis of the knee joint.
> Lumbar- narrowing L5-S1, L4-L5, L2-L3.

(Tr. at 174-175). In evaluating Claimant's postural limitations, Dr. Lateef found that Claimant could "occasionally" climb, balance, stoop, kneel, crouch, and crawl. (Tr. at 175). Claimant had no manipulative, visual, communicative, or environmental limitations. (Tr. at 176-177). There were no treating or examining source statements in the file from which Dr. Lateef based her conclusions. (Tr. at 179).

On January 11, 2005, Licensed Psychologist Kelly Daniel, M.A., evaluated Claimant's intellectual functioning, finding the following, as summarized by the Court:

> Claimant was cooperative, able to maintain attention, tearful regarding some of her history the recent loss of her Husband. She reported that she was "held back" in the second grade and was in special reading and math classes at times, but that she graduated from high school.

> Claimant's verbal IQ score was 77, which fell in the borderline mentally retarded range; her performance IQ was 84, which was in the low average range; and her full scale IQ was 78, which was in the borderline intellectual functioning range. The results were believed to be accurate.

> It appeared that Claimant was able to comprehend information at a low average level, but could not retain the information and manipulate it as necessary to perform arithmetic well. In addition, she would have trouble retaining and repeating information if required to incorporate it with other information, which is a skill at the mildly mentally retarded range.

(Tr. at 267-268).

On January 13, 2005, Kelly M. Dick, M.A., a supervised psychologist at University Psychiatric Associates conducted an initial intake interview, noting the following:

> Claimant spoke in a normal manner without stammering or stuttering; her speech was a normal rate, tone, and pace; she was oriented to person, place, time, and situation; her speech and manner were not bizarre; receptive and expressive language seemed unimpaired.

12

> Claimant's thoughts and associations were logical and coherent; she was able to sustain reasonable attention; however, she described her attention and concentration as poor.

> Ms. Dick's diagnostic impression was "Major Depressive Disorder, Recurrent, Moderate" and she needed to rule out anxiety disorder.

(Tr. at 262-266). On February 18, 2005, University Psychiatric Associates reported a "marginal improvement" in Claimant's depression. (Tr. at 256).

On January 18, 2005, Dr. Triplett found that Claimant's pain in her left arm, shoulder, and elbow were due to mild degenerative joint disease, but that she suffered from that condition in those areas only. (Tr. at 316). Dr. Triplett noted that Claimant had hypertension and that he needed to rule out diabetes. (Tr. at 317).

On April 6, 2005, a DDS physician completed a Psychiatric Review Technique Form concerning Claimant; his findings are summarized by the court below:

> Claimant had non-severe mental impairments of borderline intellectual functioning; affective disorder, characterized by appetite disturbance with change in weight, sleep disturbance, and decreased energy; moderate major depressive disorder; and anxiety.

> Claimant did not have an impairment in the category of mental retardation which is defined as "[s]ignificantly subaverage general intellectual functioning with deficits in adaptive functioning."

> On a scale of none, mild, moderate, marked, and extreme, Claimant's mental impairments rendered her mildly restricted in activities of daily living; maintaining social functioning; and maintaining concentration, persistence, or pace. There were no episodes of decompensation of extended duration.

(Tr. at 269-282).

On April 11, 2005, Fulvio Franyutti, M.D., completed a Physical RFC Assessment Form, listing the following:

13

Claimant could lift and/or carry twenty pounds occasionally and ten pounds frequently; stand and/or walk and sit with normal breaks for approximately six hours in an eight-hour work day; and push and/or pull, including hand and/or foot controls, an unlimited amount.

Claimant could occasionally climb ramps/stairs, balance, and stoop and could never climb ladders/robes/scaffolds, kneel, crouch, or crawl.

Claimant had no manipulative, visual, or communicative limitations.

Claimant had no limitations with regard to wetness, humidity, or noise, but should avoid concentrated (as opposed to moderate or all exposure) to extreme cold, extreme heat, vibration, fumes, odors, dusts, gases, poor ventilation, and hazards such as machinery, heights, etc.

(Tr. at 284-287). Dr. Franyutti also noted that in his judgment, Claimant's symptoms were attributable to medically determinable impairments. (Tr. at 288). He found Claimant to be credible and that her allegations were supported by the medical findings. Id. He adjudged her capable of performing "light" work. Id. There were no statements from a treating doctor in the file from which Dr. Franyutti formed his opinion. (Tr. at 289).

On April 15, 2005, Dr. Triplett noted that Claimant's hypertension and diabetes were controlled.  (Tr. at 298). He stated that he was "very pleased" with her blood sugar level and that her "blood pressures have been great also." *Id.*

On August 20, 2005, Cynthia L. Clay, WV Licensed Psychologist, evaluated Claimant. (Tr. at 292). Ms. Clay noted that Claimant was cooperative, that her attention and concentration were intact, that her persistence was "generally good," and that the results of the tests were considered to be valid. Id. Ms. Clay found that Claimant was

able to read at a fourth grade level and spell and perform arithmetic at a third grade level. *Id.*

On November 19, 2005, Tri-State MRI reported that Claimant had "degenerative disc disease with spinal canal, lateral recess and neural foraminal stenosis;" that her "right L4-5 neural foramen [was] very narrowed from either disc protrusion or extrusion superimposed on bulging;" and that her "spinal canal stenosis [was] most noted from L2 to L4." (Tr. at 294).

On April 14, 2006, Claimant reported to Tri-State Rehab Services of Westmoreland. (Tr. at 386-387). She was assessed as having "good rehab potential" and scheduled for physical therapy two-to-three times per week for a four-to-six week period. *Id.*

On May 13, 2006, Ms. Clay, submitted her opinion of Claimant's condition. (Tr. at 336-342).[7] Ms. Clay worked with Claimant since June 2005. (Tr. at 336). Ms. Clay's diagnosis of Claimant was "Major Depressive Disorder, Recurrent, Mild" and "Breathing Related Sleep Disorder." *Id.* On a functional imitation scale of "none, slight, moderate, marked, or extreme," Ms. Clay assessed that Claimant had a "slight" restrictive of activities of daily living; a "moderate" difficulty in maintaining social functioning; and often experienced deficiencies of concentration, persistence, or pace. (Tr. at 341).

---

[7] Claimant asserts that this evidence was obtained "after the hearing, on May 5, 2006." (Pl.'s Br. at 10). A date stamp on the document indicates that it was received by the SSA on May 19, 2006. Claimant assertion that the evidence was obtained "after the hearing" is illogical as the hearing took place on June 8, 2006. Therefore, the Court assumes that this evidence was received prior to the hearing.

**b.**   **Evidence Received Post Hearing**

On September 30, 2006, Richard Cohen, M.D., provided his medical opinion, based upon a review of Claimant's medical evidence. (Tr. at 357-362). His findings, as summarized by the court, include the following:

> Claimant's mental impairments from July 2002, when she last worked, to the present, were major depression with sleeping problems, decreased energy, decreased concentration, suicide ideation at times, decreased self esteem, borderline intellectual functioning, and anxiety disorder.

> Claimant's activities of daily living and social functioning were mildly impaired; her concentration, persistence, and pace was moderately impaired; and she had no episodes of deterioration or decomposition for extended periods of time.

> Claimant's impairments, considered in combination, did not equal any impairments listed in Appendix 1, Subpart P, Social Security Regulations No. 4.

> Claimant had a "good" ability to follow work rules; relate to co-workers; deal with the public; interact with supervisor(s); function independently; understand, remember, and carry out simple job instructions; and maintain personal appearance.

> Claimant had a "fair" ability to use judgment; deal with work stresses; maintain attention/concentration; understand, remember, and carry out complex job instructions; understand, remember, and carry out detailed, but not complex job instructions; behave in an emotionally stable manner; relate predictably in social situations; and demonstrate reliability.

> Claimant could, at a minimum, perform simple, repetitive tasks in a low-stress environment.

*Id.*

On January 30, 2007, Claimant was evaluated by Travis Hansbarger, M.D. (Tr. at 390-393). Dr. Hansberger diagnosed Claimant with chronic "LBP" with "DDD" and "CTS," which the court interprets as lower back pain with degenerative disc disease and carpel tunnel syndrome. (Tr. at 390). Dr. Hansbarger made the following observations:

16

In an eight-hour work day, Claimant could sit for approximately four hours with hourly breaks of walking for fifteen minutes and she could stand/walk less than two hours at a time.

Claimant must be able to shift positions at will from sitting, standing, or walking and must occasionally take unscheduled breaks during an eight-hour work day. Claimant did not require a cane or other assistive device to walk and can occasionally lift less than ten pounds, but never more than ten pounds.

Depression and anxiety contributed to the severity of Claimant's symptoms and functional limitations.

Claimant's physical and emotional impairments were reasonably consistent with the symptoms and functional limitations listed in the report.

Claimant frequently experienced pain or other symptoms severe enough to interfere with attention and concentration needed to perform simple work tasks and was incapable of even low stress jobs due to her psychological conditions.

Claimant could not walk a city block without rest or severe pain and could stand for five minutes before needing to sit down or walk around.

Claimant could not bend over, squat, or climb ladders and could rarely twist or climb stairs.

Claimant had significant limitations with reaching, handling, or fingering and as a result, during a work day, she could not use her hands to grasp, turn, or twist objects; could not use her fingers for fine manipulation; and could use her arms to reach overhead only five percent of the time.

(Tr. at 391-393). Dr. Hansbarger's final notation was that "[w]orking in the public sector would be difficult for [Claimant]." (Tr. at 393).

### III.   <u>Claimant's Challenges to the Commissioner's Decision</u>

Claimant asserts that the ALJ erred by (1) failing to submit the interrogatories obtained from Dr. Cohen after the hearing to the Claimant and offering the Claimant the opportunity to either question Dr. Cohen by her own interrogatories or at hearing, (2) failing to address the opinion of the Claimant's treating psychologist, and (3) relying

upon a vocational expert's testimony without allowing the vocational expert to see all of the evidence. (Pl.'s Br. at 7-11).

To the contrary, the Commissioner argues that (1) the ALJ properly entered the post-hearing evidence into the record in accordance with the Regulations, (2) substantial evidence supports the ALJ's decision that Claimant was not disabled, (3) substantial evidence supports the ALJ's finding that Claimant could perform the unskilled jobs identified by the vocational expert. (Def.'s Br. at 9-15).

## V.     <u>Discussion</u>

### a.     <u>Dr. Cohen's Post-Hearing Report</u>

Subsequent to Claimant's administrative hearing, Dr. Richard Cohen provided his opinion of Claimant's condition. (Tr. at 357-362). Claimant's first assertion of error argues that "the ALJ should have obtained an explicit waiver [of Claimant's right to request a supplemental hearing, cross examine Dr. Cohen, or submit controverting evidence] on the record either by signed statement or as an exhibit before entering Dr. Cohen's opinion on the record and relying upon it in making his decision." (Pl.'s Br. at 8).

Claimant specifically points to portions of I-2-7-15 and I-2-7-35 of the Social Security Administration Office of Disability Adjudication and Review Hearings, Appeals, and Litigation Law Manual ("HALLEX"):

> If the ALJ decides at or after the hearing that additional evidence is needed for a full and fair inquiry into the matters at issue, the ALJ will direct the HO staff to undertake the necessary development and inform the claimant of the evidence that is being developed. The ALJ will also inform the claimant that he or she will be given an opportunity to examine and comment on, object to, or refute the

evidence by submitting other evidence, requesting a supplemental hearing, or if required for a full and true disclosure of the facts, cross-examining the author(s) of the evidence.

A claimant may waive the right to examine additional evidence. However, the ALJ must neither encourage nor discourage waiver. If a claimant decides to waive such right, the waiver must be made either on the record at the hearing or in writing.

If a claimant has waived the right to examine additional evidence, the ALJ may enter it into the record without proffering it. However, if the ALJ believes the claimant should examine it, the ALJ should proffer it notwithstanding the waiver. (citations omitted)

HALLEX I-2-7-15.

If an ALJ enters posthearing evidence into the record <u>without proffer</u>, the ALJ must ensure that the claimant waived the right to examine the evidence and to appear at a supplemental hearing. The waiver may have been made on-the-record at the hearing or by a <u>signed</u> written statement.

HALLEX I-2-7-35.

Claimant either misunderstands the facts of this case or the HALLEX provisions which she cites. The ALJ in this case did not enter the evidence from Dr. Cohen *without proffer*. Thus, the ALJ was not required to obtain a waiver on the record or by a signed written statement. Rather, the ALJ sent a proffer letter on January 22, 2007 to Marie Redd, Claimant's non-attorney advocate, apprising her of the new evidence. (Tr. at 135-136). [8] The letter comports with the requirements of HALLEX I-2-7-30:

The proffer letter must:

- Give the claimant a time limit to object to, comment on or refute the evidence, submit a written statement as to the facts and law that the claimant believes apply to the case in light of the evidence submitted, submit written questions

---

[8] Claimant was represented at the administrative level by Marie Redd; attorney, William Redd; and the Redd Law Firm, all of which share the same business address. The proffer letter was sent to that location.

19

to be sent to the author(s) of the proferred evidence or exercise his or her rights with respect to requesting a supplemental hearing and the opportunity to cross-examine the author(s) of any posthearing report(s) if it is determined by the ALJ that such questioning is needed to inquire fully into the issues.

- Advise the claimant that he/she may request a subpoena to require the attendance of witnesses or the submission of records and the procedures for the requesting and issuance of a subpoena.

Therefore, Claimant argument that the ALJ did not comply with the procedures outlines in HALLEX is without merit.[9]

Claimant also cites *Goan v. Shalala*, 853 F.Supp. 218, 219 (S.D.W.Va. 1994), stating the holding of the case as the following: "[A]n ALJ must choose either to grant a claimant the right to cross-examine a consulting physician submitting a post hearing report or decline to rely upon the physician's report." (Pl.'s Br. at 8). Claimant, however, fails to appreciate the holding of that case. In *Goan v. Shalala*, the Claimant sought to remand his case because the ALJ denied him the opportunity to cross-examine a doctor who provided a post-hearing report. *Goan*, 853 F.Supp. at 219. The Court upheld the Magistrate Judge's finding that the ALJ's refusal of Claimant's request to cross-examine the doctor was an abuse of discretion under the Regulations and constituted a denial of due process. *Id. Goan* provides no support for Claimant's contention. Here, the ALJ's letter specifically advised Claimant that she could question "the author(s) of the enclosed report(s)." (Tr. at 135). Claimant never responded to the letter or requested to cross-examine Dr. Cohen.

---

[9] Dr. Cohen's report (Tr. at 357-362) does not appear directly after the proffer letter (Tr. at 135-136) in the Social Security Transcript. However, the letter states that additional evidence is enclosed and the Commissioner verifies that Dr. Cohen's report was included in this enclosure.  (Def.'s Br. at 9-10).

Lastly, Claimant cites *Goree v. Callahan*, 964 F.Supp. 1533 (N.D.Okla. 1997) and a case cited therein, *Allison v. Heckler*, 711 F.2d 145, 147 (10th Cir.). Claimant states that "[i]t has been held that the claimant is denied due process when an ALJ uses a post-hearing medical report without giving the claimant the opportunity to cross-examine the physician or rebut the report." (Pl.'s Br. at 8). Claimant similarly misunderstands the holdings of both *Goree v. Callahan* and *Allison v. Heckler*.

In *Goree*, the ALJ sent the claimant a letter notifying him that he received post-hearing evidence from a doctor and advising the claimant of his rights with respect to the new evidence. However, when the claimant requested in writing a supplemental hearing and the opportunity to cross-examine the doctor, the ALJ did not respond and instead issued his opinion denying benefits. *Goree*, 964 F.Supp. at 1536-1537. *Goree*, like the aforementioned case cited by Claimant, is not relevant to this matter. Here, the ALJ did not *deny* Claimant the right to question Dr. Cohen, to submit interrogatories, or to have a supplemental hearing. The ALJ simply advised Claimant of her rights and Claimant chose not to respond.

*Allison v. Heckler*, is likewise inapposite to this case. There, the ALJ sent the administrative hearing record to a doctor for review and then relied on the doctor's conclusions in finding the Claimant not disabled and denying benefits. The Court found that the Claimant was denied due process because he was never given the opportunity to subpoena or cross-examine the doctor or offer evidence in rebuttal. *Allison*, 711 F.2d at 147.

### b.     Treating Psychologist Ms. Clay

Claimant next asserts that the ALJ "committed clear error in not addressing the weight of the decision he gave to the opinion of the treating psychologist." (Pl.'s Br. at 10). The opinion to which Claimant refers is that of Ms. Cynthia Clay, which was expressed in her letter dated May 13, 2006. (Tr. at 336-343).

Claimant does not point to any area in which the ALJ's RFC finding is inconsistent with the opinion of Ms. Clay. Rather, Claimant argues that the ALJ did not specifically enumerate the weight which he accorded to Ms. Clay's 2006 letter and accompanying Psychiatric Evaluation Form. To the extent that the ALJ did not explicitly state the weight that he afforded to this evidence, the Court finds this to be a harmless error for the following reasons.

Courts have applied a harmless error analysis in the context of Social Security appeals.  One illustrative case provides:

> Moreover, "[p]rocedural perfection in administrative proceedings is not required. This court will not vacate a judgment unless the substantial rights of a party have been affected." *Mays v. Bowen*, 837 F.2d 1362, 1364 (5th Cir.1988). The procedural improprieties alleged by Morris will therefore constitute a basis for remand only if such improprieties would cast into doubt the existence of substantial evidence to support the ALJ's decision.

*Morris v. Bowen*, 864 F.2d 333, 335 (5th Cir. 1988); *Fisher v. Bowen*, 869 F.2d 1055, 1057 (7th Cir. 1989) ("No principle of administrative law or common sense requires us to remand a case in quest of a perfect opinion unless there is reason to believe that the remand might lead to a different result"). Our Court of Appeals, in a number of unpublished decisions, has taken the same approach.  *See*, *e.g.*, *Bishop v. Barnhart*, No.

03-1657, 2003 WL 22383983, at *1 (4th Cir. Oct 20, 2003); *Camp v. Massanari*, No. 01-1924, 2001 WL 1658913, at *1 (4th Cir. Dec 27, 2001); *Spencer v. Chater*, No. 95-2171, 1996 WL 36907, at *1 (4th Cir. Jan. 31, 1996).

In reconciling the consideration cited by Claimant that the Court "cannot determine if findings are unsupported by substantial evidence unless the [ALJ] explicitly indicates the weight given to all of the relevant evidence," *Gordon v. Schweiker*, 725 F.2d 231, 235 (4th Cir. 1984), the Court finds that the ALJ's failure to explicitly state the weight given to Ms. Clay's 2006 letter to be harmless error because it does not "cast into doubt the existence of substantial evidence to support the ALJ's decision." *Morris*, 864 F.2d at 335.

The ALJ specifically mentions Ms. Clay's letter, indicating that he considered it. (Tr. at 22-23). Further, his determination of Claimant's mental impairments and RFC are consistent with Ms. Clay's observations. The RFC finding, in relevant part, states:

> [Claimant] has a "fair" (defined as limited, but satisfactory) ability to use judgment; to deal with work stresses; to maintain attention/concentration; to understand, remember and carry out complex and detailed job instructions; to behave in an emotionally stable manner; to relate predictably in social situations; and to demonstrate reliability.

(Tr. at 20). Correspondingly, on a functional limitation scale of "none, slight, moderate, marked, or extreme," Ms. Clay assessed that Claimant had a "slight" restrictive of activities of daily living; a "moderate" difficulty in maintaining social functioning; and often experienced deficiencies of concentration, persistence, or pace. (Tr. at 341).

The entirety of the post-hearing evidence received from Ms. Clay consists of (1) Ms. Clay's letter, which states:

> I am writing in response to your request for records of my work with Peggy Hood.
> I have been working with Ms. Hood in my practice since June, 2005. My
> diagnosis of Ms. Hood is (296.31) Major Depressive Disorder, Recurrent, Mild
> and (780.59) Breathing Related Sleep Disorder.
>
> Symptoms related to these diagnoses include: depressed mood, loss of energy,
> sleep difficulty, difficulty with motivation, hopelessness, concentration problems
> and low self-esteem. She also reports having racing thoughts and irritability at
> times.
>
> Ms. Hood has been consistent in attending appointments and has participated
> well. We have addressed daily coping skills/stress management, grief/loss issues
> and family or origin issues/loss.

(Tr. at 336) and (2) a Psychiatric Evaluation Form, which consists of "check off boxes"

for which Ms. Clay checked the aforementioned disorders and symptoms and rated

Claimant's degree of limitation as discussed above. (Tr. at 341).

Ms. Clay did not include any additional comments, treatment notes, or other

evidence with the letter and form. Therefore, the evidence received from Ms. Clay does

not conflict with the ALJ's findings. As such, remand is not warranted to correct the

procedural technicality that the ALJ did not specify how much weight he afforded to Ms.

Clay's observations.

Furthermore, the ALJ's decision is supported by substantial evidence. In respect

to mental limitations, which is what Ms. Clay's evidence concerns, the ALJ thoroughly

discussed the evidence which he considered in determining that Claimant had severe

impairments of depression and borderline intellectual functioning. (Tr. at 17-18, Finding

No. 4). In addition, the ALJ implemented the "special technique," outlined at 20 C.F.R.

§§ 404.1520a and 416.920a, which is used in evaluating the severity of mental

impairments. (Tr. at 18-19, Finding No. 5). In finding Claimant's mental RFC, the ALJ

24

extensively discussed the evidence of record. (Tr. at 20-24, Finding No. 6). Claimant does not point to any area in the ALJ's decision which contravenes Ms. Clay's evidence, but only asserts a procedural error. Thus, as stated above, this argument does not warrant remand.

### c.    **<u>Hypothetical Posed to the Vocational Expert</u>**

Claimant's final assertion of error is that "the opinion of the vocational expert in this case cannot be used as substantial evidence to support the ALJ's unfavorable decision simply because the jobs cited were not in response to the hypothetical given in the decision." (Pl.'s Br. at 11).

As discussed the RFC finding in the ALJ's decision, in relevant part, states:

> [Claimant] has a "fair" (defined as limited, but satisfactory) ability to use judgment; to deal with work stresses; to maintain attention/concentration; to understand, remember and carry out complex and detailed job instructions; to behave in an emotionally stable manner; to relate predictably in social situations; and to demonstrate reliability.

(Tr. at 20).

Claimant argues that the hypothetical which the ALJ posed to the vocational expert during the hearing, however, did not include these "psychological limitations." As such, Claimant argues that the vocational expert's statement that jobs existed which the Claimant could perform is invalid because she did not base her opinion on a hypothetical which fairly included all of Claimant's impairments. (Pl.'s Br. at 11).

Claimant misunderstands the requirement that the opinion of a vocational expert is not helpful if it is not delivered "in response to proper hypothetical questions which fairly set out all of [a] claimant's impairments." *Walker v. Bowen,* 889 F.2d 47, 50 (4th

Cir. 1989). A hypothetical posed to the expert need not reflect the RFC finding in the ALJ's decision with explicit precision in order to fairly set out a claimant's impairments. Rather, the hypothetical must "adequately reflect" the RFC for which the ALJ had sufficient evidence. *Fisher v. Barnhart*, 181 Fed. Appx. 359, 364 (4th Cir. 2006), quoting *Johnson v. Barnhart,* 434 F.3d 650 (4th Cir. 2005).

Here, the ALJ first questioned the vocational expert whether the Claimant could perform any of her past work, considering the following limitations:

> [H]er age of 51, her one year of business school that she went through, training and work experience, exertional impairments that limit her to light work. Non-exertionally, she should never climb ladders, ropes, or scaffolds, kneel, crouch, or crawl. She should only occasionally climb ramps and stairs, balance, and stoop. And she should avoid extreme cold, heat, vibration, air pollutants, and hazards.

(Tr. at 440-441). Claimant is correct that this hypothetical does not include mental limitations. However, the ALJ proceeded to question the expert if she could provide "two examples of light and sedentary, unskilled jobs." (Tr. at 441). As stated by the Fourth Circuit in *Fisher*, 181 Fed. Appx. at 364, "unskilled work" is a term of art, defined by regulation as "work which needs little or no judgment to do simple duties that can be learned on the job in a short period of time." 20 C.F.R. § 404.1568(a).

The ALJ's hypothetical fairly reflected Claimant's mental impairments without explicitly listing them. Like this case, the ALJ in *Fisher* found that the claimant suffered from borderline intellectual functioning, among other impairments. *Fisher*, 181 Fed. Appx. at 362. The borderline intellectual functioning, in combination with an adjustment disorder, rendered the claimant mildly restricted in activities of daily living and social functioning and moderately restricted in maintaining concentration,

persistence, and pace. *Id.* However, the ALJ did not state these restrictions verbatim in the hypothetical posed to the vocational expert, but rather told the expert to assume that the claimant was capable of only "unskilled work" and that he could not "perform complex tasks." *Id.* at 364. The Court found that the hypothetical adequately represented the limitations that the ALJ listed in the RFC assessment. *Id.*; *see also Howard v. Massanari,* 255 F.3d 577, 582 (8th Cir. 2001) ("We find that [a hypothetical question] describing [the claimant] as capable of doing simple work adequately accounts for the finding of borderline intellectual functioning").

The purpose of a hypothetical question posed to a vocational expert is to elicit a response as to whether a claimant can work, considering his or her limitations. Therefore, where the hypothetical encompasses the Claimant's mental limitations by virtue of questioning whether she can perform any "unskilled" jobs, the omission of the mental limitations in the hypothetical is justified.

Here, the ALJ acknowledges the omission of Claimant's mental impairments in the hypothetical that he posed to the expert. The ALJ states that he afforded great weight to Dr. Cohen's assessment, which was received after the hearing, in determining the mental limitations in the Claimant's RFC. (Tr. at 24). However, he further states that nevertheless, the mental limitations "would not change the jobs named by the vocational expert at the hearing, since all of those jobs are simple and routine in nature." *Id.* For the reasons stated above, the ALJ's conclusion is correct.

Based on the hypothetical posed, the vocational expert identified that Claimant could perform unskilled jobs such as bench worker, information clerk, house

sitter/companion, and grader/sorter. Because these positions are "unskilled" jobs, they were based on an assumption of limited mental ability. Therefore, the hypothetical and the jobs cited in response are consistent with the ALJ's findings concerning Claimant's mental limitations and the omission did not render the vocational expert's testimony inaccurate.

**VI.** **Conclusion**

After a careful consideration of the evidence of record, the Court finds that the Commissioner's decision **IS** supported by substantial evidence. Accordingly, by Judgment Order entered this day, the final decision of the Commissioner is **AFFIRMED** and this matter is **DISMISSED** from the docket of this Court.

The Clerk of this Court is directed to transmit copies of this Order to all counsel of record.

**ENTERED:** November 3, 2010.

Cheryl A. Eifert
United States Magistrate Judge

28